No. 25-1486

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

—————————

**UNITED STATES OF AMERICA,
APPELLEE**

**V.**

**JOHNNY BARROS BRANDAO,
DEFENDANT-APPELLANT**

—————————

**ON APPEAL FROM A JUDGMENT IN A CRIMINAL CASE
ENTERED IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

—————————

**BRIEF FOR THE UNITED STATES**

—————————

**LEAH B. FOLEY
UNITED STATES ATTORNEY**

**DONALD C. LOCKHART
ASSISTANT U.S. ATTORNEY
JOHN JOSEPH MOAKLEY U.S. COURTHOUSE
1 COURTHOUSE WAY
SUITE 9200
BOSTON, MASSACHUSETTS 02210
(617) 748-3211**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... iii

STATEMENT OF THE ISSUES.................................................................................1

STATEMENT OF THE CASE.....................................................................................1

      A.     Offense facts.................................................................................1

      B.     Procedural history overview.........................................................3

SUMMARY OF ARGUMENT ...................................................................................4

ARGUMENT ...............................................................................................................6

I.     The district court did not abuse its discretion under Rule 403, and any error was harmless .............................................................................6

      A.     Introduction and standard of review ...................................................6

      B.     Procedural history..............................................................................6

      C.     There was no abuse of discretion .......................................................9

      D.     Any error was harmless.....................................................................14

II.    The unpreserved voir dire claim fails the plain-error test ...........................17

      A.     Procedural history............................................................................17

      B.     There was no plain error..................................................................18

III.   The "missing witness" claims are meritless, and any error was harmless ....21

      A.     Procedural history............................................................................21

      B.     There was no clear error or abuse of discretion ................................23

      C.     Any error was harmless....................................................................27

CONCLUSION ..................................................................................................28

CERTIFICATE OF COMPLIANCE .................................................................29

CERTIFICATE OF SERVICE .........................................................................30

# TABLE OF AUTHORITIES

## CASES

*Puckett v. United States*,
   556 U.S. 129 (2009)......................................................................................19

*United States v. Aboshady*,
   951 F.3d 1 (1st Cir. 2020)...................................................................... 25-28

*United States v. Armenteros-Chervoni*,
   133 F.4th 8 (1st Cir. 2025)...........................................................................14

*United States v. Caparotta*,
   676 F.3d 213 (1st Cir. 2012)........................................................................17

*United States v. Casanova*,
   886 F.3d 55 (1st Cir. 2018)..........................................................................19

*United States v. Castillo*,
   158 F.4th 257 (1st Cir. 2025)..........................................................................6

*United States v. Cezaire*,
   939 F.3d 336 (1st Cir. 2019).................................................................. 19-20

*United States v. Dominguez Benitez*,
   542 U.S. 74 (2004)......................................................................................20

*United States v. Fargas-Reyes*,
   125 F.4th 264 (1st Cir. 2025).......................................................................20

*United States v. Figueroa-Cartagena*,
   612 F.3d 69 (1st Cir. 2010)..........................................................................19

*United States v. Ford*,
   839 F.3d 94 (1st Cir. 2016).................................................................... 16-17

*United States v. Franklin*,
   51 F.4th 391 (1st Cir. 2022).........................................................................19

*United States v. Galíndez*,
   999 F.3d 60 (1st Cir. 2021)..........................................................................10

*United States v. García-Sierra*,
　994 F.3d 17 (1st Cir. 2021)......................................................................... 6, 14, 16

*United States v. Gonyer*,
　761 F.3d 157 (1st Cir. 2014).................................................................................13

*United States v. Gordon*,
　954 F.3d 315 (1st Cir. 2020).................................................................................19

*United States v. Henry*,
　848 F.3d 1 (1st Cir. 2017)......................................................................................11

*United States v. Jimenez-Torres*,
　435 F.3d 3 (1st Cir. 2006).....................................................................................27

*United States v. Maldonado-Vargas*,
　159 F.4th 69 (1st Cir. 2025)..................................................................................27

*United States v. Meader*,
　118 F.3d 876 (1st Cir. 1997).................................................................................19

*United States v. Medina*,
　155 F.4th 11 (1st Cir. 2025)..................................................................................12

*United States v. Moreno Morales*,
　815 F.2d 725 (1st Cir. 1987).................................................................................13

*United States v. Orlandella*,
　96 F.4th 71 (1st Cir. 2024)....................................................................................24

*United States v. Pabon*,
　819 F.3d 26 (1st Cir. 2016)...................................................................................20

*United States v. Pena*,
　24 F.4th 46 (1st Cir. 2022)............................................................................... 20-21

*United States v. Perez-Cubertier*,
　958 F.3d 81 (1st Cir. 2020)...................................................................................13

*United States v. Pridgen*,
　518 F.3d 87 (1st Cir. 2008)...................................................................................16

*United States v. Rathbun*,
98 F.4th 40 (1st Cir. 2024)................................................. 10, 14-16, 20

*United States v. Rivera Calderón*,
578 F.3d 78 (1st Cir. 2009).......................................................13

*United States v. Soler-Montalvo*,
44 F.4th 1 (1st Cir. 2022)...................................................... 6, 12, 14

*United States v. Urian*,
858 F.2d 124 (3d Cir. 1988)......................................................19

*United States v. Varoudakis*,
233 F.3d 113 (1st Cir. 2000)......................................................11

*United States v. Vasquez-Landaver*,
128 F.4th 358 (1st Cir.),
*cert. denied*, 145 S. Ct. 2767 (2025)....................................................24

*United States v. Velazquez-Fontanez*,
6 F.4th 205 (1st Cir. 2021)......................................................13

*Wilder v. United States*,
806 F.3d 653 (1st Cir. 2015)......................................................21

## STATUTES AND RULES

18 U.S.C. § 1542 ....................................................................3

Fed. R. Crim. P. 51(b)........................................5-7, 11-13, 16, 19

Fed. R. Evid. 403 ...........................................................5-7, 11-13, 16

Fed. R. Evid. 404(b)........................................... 6, 9-10, 13, 17

Fed. R. Evid. 404(b)(1) ...........................................................9, 13

Fed. R. Evid. 404(b)(2) ........................................... 7, 9, 12

v

## STATEMENT OF THE ISSUES

1.      The district court did not abuse its discretion under Rule 403, and any error was harmless.

2.      The unpreserved voir dire claim fails the plain-error test.

3.      The "missing witness" claims are meritless, and any error was harmless.

## STATEMENT OF THE CASE

### A.      Offense facts

Defendant-appellant Johnny Barros Brandao is a dual citizen of the United States and Cape Verde. In 2021, Cape Verdean authorities charged Brandao with two homicide offenses and other crimes. [A: 225, 483, 502, 506].[1] He faced potential penalties of 15-30 years in prison if convicted. [A: 225]. He was held in pretrial detention for 16 months. [A: 482-483, 497-508]. He was released from custody on December 12, 2022, but was barred from leaving Cape Verde pending his trial on the charges. [A: 217-220, 506-507, 510, 512].[2]

---

[1] The appendix is cited as "A:__" and Brandao's brief as "Br.__."

[2] Brandao repeatedly states that "the charges were declared null and void because [he] was never informed of the charges against him in his native language." [Br. 11 n.1, 26-27, 33-34]. In fact, it was "the notice of the public indictment against [Brandao] [that] was declared null and void" for this reason, which led the court to "dismiss the measure of pretrial detention" and to release him from pretrial custody on conditions. [A: 218, 220, 506-507]. The charges themselves remained fully intact pending trial [*ibid.*], as Brandao stipulated below [A: 225; *infra* 8].

1

Brandao was deemed a flight risk, and his U.S. and Cape Verdean passports were retained by Cape Verdean authorities. [A: 218, 220-221, 240-241, 250, 514, 516]. Cape Verdean records reflect that both passports were initially held by the local police and were then transferred to the clerk of the court and the prosecutor's office. [A: 220-221, 240-241, 250, 514, 516]. During the later investigation of this case, an agent traveled to Cape Verde in 2023 and personally inspected and photographed both passports at the Cape Verdean prosecutor's office; as late as the eve of trial in 2024, that is where both remained. [A: 243-247, 253, 256, 563-565 (2023 photos of passports), 585-620 (2024 photos of passports)].

Within two weeks of being released, Brandao managed to flee to Senegal, the country nearest to Cape Verde on the African coast. [A: 182-183, 238-239, 568-569].[3] On December 27, 2022, Brandao emailed the U.S. Embassy in Dakar, Senegal and claimed he lost his U.S. passport in Senegal two days previously. [A: 181-187, 517]. The same day, Brandao completed an application for a temporary emergency passport in which he affirmed that on December 25, 2022, in Dakar: "I went out for dinner and [by] the time I got back I hand [sic] lost my passport." [A: 187-199, 519]. The application contained multiple warnings that it was a crime to make false statements on the form and that doing so could lead to a prosecution for the very offense with which Brandao was later charged; he nonetheless signed the application

---

[3] How he did so remains a mystery.

in two places and affirmed that all the statements in it were true. [A: 193-195, 199, 519-522]. During an interview with a consular official as part of the application process, Brandao repeated his story about losing his U.S. passport in Dakar. [A: 202-206, 209-210, 570-579]. He did not divulge that, in reality, his passport had been confiscated as part of the pending criminal matters in Cape Verde. [A: 215-216].

The U.S. Embassy in Dakar duly issued Brandao an emergency U.S. passport on December 28, 2022. [A: 202, 207-209, 525-526]. Within a day or two, Brandao used this passport to leave Senegal on a flight to New York, where he arrived on December 30, 2022. [A: 224]. When Brandao was arrested in Boston in 2023, he was applying for a replacement passport, and he possessed the emergency passport issued in Dakar and other identifying documents. [A: 264-274, 530-562]. As late as September 2024, just before trial, Brandao's original U.S. passport was still in the custody of the prosecutor's office in Cape Verde. [A: 245-247, 253, 604-620].

B.    Procedural history overview

A federal grand jury in the District of Massachusetts charged that Brandao knowingly and willfully made a false statement in applying for a passport when he claimed he had lost his original passport while out to dinner in Dakar on December 25, 2022, in violation of 18 U.S.C. § 1542. [A: 19-21].

At a three-day trial, the government presented the evidence summarized above. Brandao offered no evidence in his defense. [A: 288]. Defense counsel

3

argued to the jury, however, that: (a) references in Cape Verdean records to the "return" of the passports meant that they were returned to Brandao rather than returned between offices of the Cape Verdean government; and (b) it was possible Brandao really did lose his U.S. passport at a restaurant in Dakar. [A: 315-328]. The defense offered no coherent explanation, however, for why both passports were physically present in the files of the Cape Verdean prosecutor in 2023 and just before trial in 2024. [A: 315-328]. After brief deliberations, the jury rejected this defense and convicted Brandao. [A: 352-355, 362].

The district court sentenced Brandao to five years in prison. [A: 16]. It entered judgment on January 23, 2025. [A: 16]. Brandao's notice of appeal was docketed four months later. [A: 16]. The government agreed it should be considered timely, however, and this Court accepted that concession. [6/12/25 Order].

Additional procedural details will be set forth below as part of the discussion of the three issues presented on appeal.

## SUMMARY OF ARGUMENT

1.    The fact that Brandao was fleeing serious criminal charges when he stated he lost his passport in Dakar was powerful proof that he acted knowingly and willfully in making that statement to get the emergency passport that enabled him to complete his flight. The charges also supplied the key context for showing why the statement itself was a bald-faced lie since his passport had been seized in Cape Verde

due to those very charges. Given the high probative value of the evidence, the brevity of the stipulation concerning the charges, the court's firm cautionary instructions, and other factors, the court did not abuse its discretion in deciding the evidence's probative worth was not "substantially outweighed" by the risk of "unfair prejudice." Fed. R. Evid. 403. In any event, it is highly probable any error did not spell the difference between acquittal and conviction in light of the strength of the government's case, the absence of a viable defense, and further considerations.

2.    Two weeks before the jury was empaneled, Brandao proposed multiple voir dire questions, including one about the Cape Verdean charges. Yet he never asked the court to pose that question to the venire panel at any point during the later empanelment, so his claim here is unpreserved. He does not try to satisfy the plain-error standard—resulting in waiver—and cannot do so anyway.

3.    The court did not clearly err in finding that Cape Verde had refused to allow a witness from the Cape Verdean prosecutor's office to testify at trial (to confirm the passports were never returned to Brandao), and that the government was powerless to compel the attendance of such a witness. It follows the court did not abuse its discretion it declining to instruct the jury that it could infer that such testimony would have hurt the government's case and in precluding arguments to that effect. A decision of this Court—not addressed by Brandao—is squarely on point. And there is no likelihood that any error altered the verdict.

# ARGUMENT

## I.    The district court did not abuse its discretion under Rule 403, and any error was harmless

### A.    Introduction and standard of review

Brandao argues the district court erred under Rule 403 in admitting the stipulated evidence concerning the Cape Verdean homicide charges. [Br. 19-28]. Such rulings are reviewed for an abuse of discretion. *See United States v. García-Sierra*, 994 F.3d 17, 30, 32 (1st Cir. 2021). In this regard, "the standard for exclusion under Rule 403 is a high one," and the Court will reverse a "battlefield" Rule 403 weighing "only in the rarest and most compelling cases." *United States v. Soler-Montalvo*, 44 F.4th 1, 16 (1st Cir. 2022); *accord United States v. Castillo*, 158 F.4th 257, 274 (1st Cir. 2025). There was no such abuse here. And regardless, it is highly probable that any error did not alter the jury's verdict.

### B.    Procedural history

Before trial, the government moved *in limine* to admit evidence of the Cape Verdean charges (but not the underlying allegations), explaining why they were highly probative of Brandao's motive for traveling to Senegal and applying for the emergency passport in Dakar and to prove that he acted knowingly and willfully in falsely stating he had lost his original passport in Dakar. [A: 12, 432-435]. Later the same day, Brandao moved to exclude this evidence, citing Rules 404(b) and 403. [A: 12, 437-441]. In opposing this motion, the government further explained the

6

relevance of the evidence; disclaimed any intention of drawing a forbidden propensity inference; requested a limiting instruction to address any risk of unfair prejudice; and pointed out that if the jury only learned that Brandao had faced generic "criminal charges," it "might conclude that the offenses were minor and not a reason to flee Cape Verde and make a false statement on a U.S. passport application." [A: 13, 443-447].

At a pretrial conference, the district court found the Cape Verdean homicide charges were probative of motive, knowledge, and willfulness under Rule 404(b)(2) and were not unfairly prejudicial under Rule 403. [A: 36-38]. The court ruled, however, that the government could only admit the bare fact of the charges and the penalties Brandao faced, subject to an appropriate limiting instruction. [A: 36-38]. The court also invited the parties to "reach an alternative agreement that comports with the terms of this Court's ruling" [A: 38], possibly through a stipulation [A: 39]. The defense did not offer further argument at the hearing.

On the first day of trial, defense counsel noted that she and the government "largely agree on the proposed language [of a stipulation] for the homicide charges," including "the language for the actual charges and the penalty that Mr. Brandao's facing, [and] the dates of the homicides." [A: 163-164]. The only point in contention concerned whether the stipulation should state that Brandao had denied both murder charges (when court records reflected he had only denied one) or whether there was

7

some other language that could more neutrally cover the subject, such as that no trial had occurred and the charges remained pending. [A: 163-164]. The court encouraged counsel to agree on a compromise approach [A: 165], which they did.

During trial, the government read the following agreed-upon stipulation to the jury:

> The defendant, Johnny Brandao, was charged with serious offenses in Cape Verde, including two separate homicides. The potential penalty for a homicide conviction in Cape Verde is 15 to 30 years imprisonment. One homicide allegedly occurred on or around March 27, 2014, and the second homicide allegedly occurred on or around July 26, 2021. Mr. Brandao's Cape Verdean trial on the above-referenced defenses [sic] has not yet occurred and the charges remain pending.

[A: 225]. There was no request for a limiting instruction at the time.

Brandao asked the court to include such an instruction in its final charge. [A: 469-470]. At the charge conference, the court said it would "give the substance of what the defendant has asked [for] but I won't give it four times [in the final charge], which is basically what the defendant has asked me to do." [A: 298]. When the court asked for "[a]ny comments," defense counsel said nothing about the limiting instruction. [A: 298-299]. After the government inquired about the language the court intended to use in that instruction, the court read it verbatim. [A: 299-300]. Defense counsel did not object or suggest changes to the court's wording. [A: 300-302].

In its final instructions, the court warned the jury about the narrow purpose

for which the Cape Verdean charges had been admitted, as it had previewed at the

charge conference:

> You have heard evidence that the defendant was facing, and still is facing, charges of serious crimes, including homicide in Cape Verde. You may not consider that evidence to infer that, because of his character, the defendant carried out the acts charged in this case. You may consider such evidence only for the limited purpose of deciding: First, whether defendant had a motive or the opportunity to commit the acts charged in the Indictment; and, second, whether defendant had the state of mind or intent necessary to commit the crime charged in the Indictment.
>
> Remember, this is the only purpose for which you may consider evidence of the pending charges against the defendant. You may not consider them as evidence of his character to support an inference that he committed the acts charged in this case.

[A: 342-343]. Defense counsel offered a minor tweak to this language which the

court declined to give and that is not pursued on appeal. [A: 350].

## C.    There was no abuse of discretion

The first part of Rule 404(b) states: "Evidence of any other crime, wrong, or

act is not admissible to prove a person's character in order to show that on a

particular occasion the person acted in accordance with the character." Fed. R. Evid.

404(b)(1). The second part, however, sets forth a non-exhaustive list of "[p]ermitted

[u]ses" of such evidence: "This evidence may be admissible for another purpose,

such as proving motive, opportunity, intent, preparation, plan, knowledge, identity,

absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

9

This Court has held that, given this text, Rule 404(b) "is one of inclusion, since one purpose is prohibited, and many others are permitted." *United States v. Rathbun*, 98 F.4th 40, 60 (1st Cir. 2024). Thus, "a judge performing a 404(b) analysis must ask whether the other-acts evidence is specially relevant to something other than a defendant's character . . . knowing that the special-relevance 'standard is not particularly demanding.'" *United States v. Galíndez*, 999 F.3d 60, 66 (1st Cir. 2021).

Here there plainly was such special relevance, as the district court found. [A: 36-38]. Brandao does not dispute this. [Br. 19-28]. It is easy to see why.

At the time Brandao made his false statement on the emergency passport application, he was fleeing criminal charges in Cape Verde and needed that passport to successfully complete his flight and return to the United States. Brandao thus had a strong motive to get the passport by any means possible. This motive, in turn, was powerful proof that he acted knowingly and willfully in falsely stating he had lost his original passport while out to dinner in Dakar. The pending criminal charges also supplied the critical context not just for Brandao's flight and his need for an emergency passport, but for explaining why his original passport could not have been lost in Dakar: It was continuously in the possession of the Cape Verdean government due to those very charges and the judicial ruling that Brandao was a flight risk and was barred from leaving Cape Verde.

10

As the government pointed out [A: 443-447], without a clear understanding of the gravity of the charges Brandao was facing, the jury would not have grasped the true extent of his incentive to flee and how imperative it was for him to obtain an emergency passport to effectuate that flight. The dire nature of Brandao's predicament would not have been fully conveyed by a generic description of the charges as "serious" and carrying "potential" penalties of up to 15-30 years in prison. [A: 225; *supra* 8].

For these reasons, the stipulated evidence had exceptionally high "probative value." Fed. R. Evid. 403. On the other side of the scale, there was nothing in the agreed-upon facts that "invite[d] the jury to render a verdict on an improper emotional basis," such as "undeniably explosive" or "shocking" details "likely to inflame the jury." *United States v. Varoudakis*, 233 F.3d 113, 122 (1st Cir. 2000) (cleaned up). The charges were just that: charges, and not convictions. And the stipulation did not describe any underlying allegations. Further cutting against the risk of unfair prejudice was the sheer dissimilarity between the homicide charges and the passport fraud alleged here. *See United States v. Henry*, 848 F.3d 1, 9 (1st Cir. 2017) (observing that the "similarity between the defendant's prior criminal conduct and the charged offense . . . increases the risk that the jury will draw an improper inference of propensity that unfairly prejudices the defendant's case.").

11

In addition, the district court gave a forceful limiting instruction quoted in full above. [A: 342-343; *supra* 9]. Consistent with that instruction, the government's arguments to the jury in opening, closing, and rebuttal all hewed to the narrow purpose for which the court admitted the evidence. [A: 175-178, 306-315, 328-333]. Indeed, the first words out of the prosecutor's mouth in both opening and closing were that the case was "not about" the Cape Verdean charges but rather "about what the defendant did to avoid facing those charges." [A: 175, 306].[4] Brandao "offers no record-based reason to conclude that the jury would have ignored [the district court's] . . . express instructions, and thus [this Court is] bound to follow the well-established principle that juries are presumed to follow a court's instructions." *United States v. Medina*, 155 F.4th 11, 21 (1st Cir. 2025). There is no sound reason to dispense with that principle here.

Given "the high probative value of the evidence," *Soler-Montalvo*, 44 F.4th at 18, and the factors just discussed, the district court did not abuse its discretion in deciding that its probative worth was not "substantially outweighed" by the risk of "unfair prejudice." Fed. R. Evid. 403.

Although cases involving claims of error under Rules 404(b)(2) and 403 are by their nature factually idiosyncratic, several lend support to the court's ruling. *See,*

---

[4] Contrary to Brandao's terse comment, this line of argument did not "cast [him] as guilty of the charges" [Br. 26], which may explain why his counsel did not object to it below.

*e.g.*, *United States v. Velazquez-Fontanez*, 6 F.4th 205, 219-20 (1st Cir. 2021) (district court properly admitted "evidence that [defendant] had killed two people to acquire control of two drug points"); *United States v. Perez-Cubertier*, 958 F.3d 81, 87-90 (1st Cir. 2020) (affirming admission of evidence concerning uncharged murders on plain-error review); *United States v. Gonyer*, 761 F.3d 157, 162-64 (1st Cir. 2014) (affirming admission of testimony by minor victim detailing defendant's prior uncharged acts of sexual abuse); *United States v. Rivera Calderón*, 578 F.3d 78, 98 (1st Cir. 2009) (no error in admitting testimony that described uncharged murders "matter-of-factly, ... leaving out graphic details"); *United States v. Moreno Morales*, 815 F.2d 725, 739 (1st Cir. 1987) (upholding admission of evidence concerning "details pertaining to the beatings and actual killing of the two [victims]" in a case involving charges of perjury and obstruction of justice). And unlike in these cases, here the jury only heard about charges, not the underlying details of crimes.

The circumstances here are far removed from those present in the main case Brandao relies upon [Br. 20-22], where this Court held that a district court abused its discretion under Rule 403. There, the Court took pains to emphasize the Rule 404(b) evidence (1) had only "marginal permissible relevance" since it was not even "straightforwardly connected" to the defendant; (2) was "lengthy" and "confusing," consisting of "disjointed pieces of . . . colorful presentation" that "spanned three witnesses and two days of trial" and that "sparked the introduction of photographs

and the playback of a recorded phone call," resulting in a "mini-trial"; and (3) was "unaccompanied by sufficient guidance from the court," since the deficient limiting instructions did not "guide the jury's attention away from the forbidden propensity inference by clearly directing it toward the specific permissible relevance" of the evidence. *García-Sierra*, 994 F.3d at 32-35. None of these unusual features is present here.

In sum, this is not one of the "rare" and "compelling" cases where reversal of the district court's "battlefield" Rule 403 weighing is mandated by the record. *Soler-Montalvo*, 44 F.4th at 16, 19.

### D.    Any error was harmless

As Brandao recognizes [Br. 23], his conviction must be affirmed if it is "highly probable" the alleged Rule 403 error did not spell the difference between acquittal and conviction. *See United States v. Armenteros-Chervoni*, 133 F.4th 8, 31 (1st Cir. 2025). That standard is easily met for five main reasons.

First, "abundant evidence incriminated," *Rathbun*, 98 F.4th at 61, Brandao. There was no dispute that Brandao penned the statement in the passport application that he had lost his passport while out to dinner in Dakar—despite warnings that false statements in such applications are punishable as criminal offenses—and that he repeated that story during the consular interview that led to approval of the application. There was also no question that Cape Verdean records documented the

14

fact that Brandao's original passport was transferred from the police, to the court, and then to the prosecutor's office, where it was physically present in 2023 and just before trial in 2024. The notion that references in the records to the "return" of the passport meant that it was returned to Brandao (as opposed to internally between offices of the Cape Verdean government) made no sense in light of this evidence and the stark reality that he was deemed a flight risk and barred from leaving Cape Verde pending trial. Moreover, the defense offered no plausible theory for how a passport purportedly lost in Dakar would magically reappear in the files of the Cape Verdean prosecutor's office months later.[5]

Second, the joint stipulation concerning the Cape Verdean charges was "brief and factual." *Rathbun*, 98 F.4th at 61.

Third, "the government advanced no overt"—or even implicit—"propensity argument relative" to the stipulation. *Rathbun*, 98 F.4th at 61. Instead, it adhered to the narrow theory of the charges' relevance in its opening, closing, and rebuttal. [A: 175-178, 306-315, 328-333].

---

[5] On appeal, Brandao now says "it is not out of the realm of possibility" that someone in Dakar found the passport and returned it to the local U.S. Embassy that had issued him an emergency passport, after which that embassy, instead of retaining or destroying it, decided—for reasons unknown—to mail it to the prosecutor's office in Cape Verde. [Br. 27]. This conjectural chain of events is fanciful, however, which may explain why defense counsel made only the vaguest nod to it in her closing. [A: 323-324].

Fourth, the district court gave cautionary instructions on the discrete purpose of the evidence [A: 342-343, *supra* 9], that effectively "cabined how the jury could consider it." *Rathbun*, 98 F.4th at 61. Although Brandao now faults the court for not giving such an instruction just after the evidence was admitted [Br. 25-26], he never asked the court to do so below, whether at the time [A: 225-226] or at the earlier pretrial conference discussing this subject [A: 36-39].

And fifth, in assessing any prejudicial impact, it is important to bear in mind that the jury properly heard—at the very least—that the Cape Verdean charges were "serious" and punishable by 15-30 years in prison, and that Brandao's passport was confiscated as part of this process and he was barred from leaving Cape Verde. The relevant question, therefore, is whether, assuming it was error for the jury to learn the added detail that the charges involved an as-yet-unproven allegation of "homicide," it is nonetheless "highly probable" that this error—standing alone— "did not affect the verdict." *United States v. Pridgen*, 518 F.3d 87, 91 (1st Cir. 2008). There is no ground for holding that the labeling of the charges played such a pivotal role given the other factors discussed above.

This case compares favorably with *García-Sierra*, where, despite the serious and multi-faceted nature of the Rule 403 problems, 994 F.3d at 32-35, this Court nonetheless affirmed principally because the evidence of the defendant's guilt "was strong," *id*. at 35; *see also, e.g., United States v. Ford*, 839 F.3d 94, 109-10 (1st Cir.

2016) (any error in admitting Rule 404(b) evidence was harmless even though evidence had marginal probative value given express concessions of defense counsel in opening statements, it was "extremely similar" to the charged drug offense, and it occurred nine years before the charged conduct).[6]

## II.    The unpreserved voir dire claim fails the plain-error test

### A.    Procedural history

Two weeks before trial, Brandao filed a document listing multiple proposed voir dire questions, including this one: "This case involves testimony about murder charges in a different country. Does the fact that murder charges are involved in the case cause you any concern about your ability to be fair and impartial?" [A: 363].

At a pretrial conference held two days later, the district court and the parties discussed voir dire issues. [A: 48-51]. As part of this, the court noted it was "pretty liberal about the extent of questioning from counsel" during voir dire of individual prospective jurors. [A: 48]. Defense counsel said nothing about her proposed voir

---

[6] Brandao notes parenthetically [Br. 21] that his counsel objected on relevance grounds to testimony that his cases had generated "media attention" in Cape Verde. [A: 240]. But he does not develop any argument on this subject, resulting in waiver. *See United States v. Caparotta*, 676 F.3d 213, 218 (1st Cir. 2012). In any event, the testimony, consisting of six words ("I was aware of media attention," A: 240), was relevant to show why it would have been too risky for Brandao to apply for an emergency passport in Cape Verde, as the government argued to the jury [A: 311-312]. Likewise, Brandao's bare references to "due process" in his argument title [Br. 19] and in a conclusory sentence [Br. 28] are waived and unavailing.

dire questions, possibly because she realized she would be able to ask one or more of them during individual voir dire [A: 48-51], as happened.

It took two hours to empanel the jury. [A: 63-155]. At no point during this process did defense counsel ask the court to put her proposed voir dire questions to the venire panel as a whole. [A: 63-155]. When a prospective juror said his cousin had been convicted of murder, however, counsel asked for—and readily received— permission from the court to ask him: "You may hear some evidence that Mr. Brandao was charged with murder in a foreign country. Would that affect your ability to be fair and impartial given your family's circumstances?" [A: 130]. After the prospective juror responded that the "events were pretty traumatic" for his family and said it would be "very hard to not be influenced by emotion," the court excused him from service. [A: 131]. Counsel never made a similar inquiry of any of the other prospective jurors.

## B.    There was no plain error

On appeal, Brandao argues the district court was required to include his proposed question concerning the homicide charges among those that it posed to the entire venire panel at the outset of the empanelment. [Br. 28-30]. By not asking this question, he maintains, the court denied him his right to "a fair and impartial jury, in violation of [the] Sixth and Fourteenth Amendment[s]." [Br. 30].

18

Because defense counsel never asked the court to take this action at any point during the empanelment, however, review is at best for plain error.[7] The mere fact that, two weeks before empanelment, counsel submitted a list of multiple proposed voir dire questions that included the one now cited on appeal [A: 363] was not enough to preserve the issue. *See United States v. Urian*, 858 F.2d 124, 125-27 (3d Cir. 1988). This follows from settled law that "[t]o preserve a claim of error, a party must object to the district court's action in a timeous manner and inform the court of the 'grounds for that objection.'" *United States v. Franklin*, 51 F.4th 391, 400 (1st Cir. 2022) (quoting Fed. R. Crim. P. 51(b)); *see also Puckett v. United States*, 556 U.S. 129, 134-35 (2009) (Rule 51(b) requires a "contemporaneous" objection to discourage "sandbagging").

The record just discussed [*supra* 17-18] refutes Brandao's assertions that the court (1) "declined to explore any potential bias [due to the expected evidence of the homicide charges] during jury impanelment" [Br. 9], (2) "declined to inform [prospective jurors] that they would hear that Brandao was charged with murder in a foreign county" [Br. 24], and (3) "rejected [his] request" to ask his proposed voir

---

[7] *See, e.g.*, *United States v. Gordon*, 954 F.3d 315, 325 (1st Cir. 2020); *United States v. Cezaire*, 939 F.3d 336, 338-39 (1st Cir. 2019); *United States v. Casanova*, 886 F.3d 55, 60 (1st Cir. 2018); *United States v. Figueroa-Cartagena*, 612 F.3d 69, 86 (1st Cir. 2010); *United States v. Meader*, 118 F.3d 876, 879-80 (1st Cir. 1997).

19

dire question on this issue [Br. 24]. There was nothing to "decline" or "reject" given that defense counsel never pursued the issue at empanelment.

Brandao makes no effort to satisfy the plain-error standard on appeal, so his claim is outright waived. *See Rathbun*, 98 F.4th at 58 (citing *United States v. Pabon*, 819 F.3d 26, 33 (1st Cir. 2016)). The Court "need say no more." *Id.*

Waiver aside, Brandao fails the second plain-error prong because he does not even come close to establishing that the district court's failure *sua sponte* "to ask such a question [about the homicide charges] was a clear or obvious error." *Cezaire*, 939 F.3d at 340. Brandao points to no persuasive authority, let alone a "binding" on-point decision, *United States v. Fargas-Reyes*, 125 F.4th 264, 271 (1st Cir. 2025), supporting his newly-constructed constitutional theory [Br. 28-30], which fatally undermines any effort he may make in his reply brief to show an obvious error, *id*.

Brandao also fails the third plain-error prong because he cannot carry his burden of demonstrating that, had the district court asked his proposed question about the homicide charges, there is a "reasonable probability" that "the result of the proceeding would have been different." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004) (cleaned up). There is no basis in the record for thinking it is likely that one or more of the jurors who were seated would have been struck had this question been asked. Still less is there a basis for holding that there is "a reasonable probability that the verdict would have been different," *United States v.*

20

*Pena*, 24 F.4th 46, 63 (1st Cir. 2022), if the composition of the jury had been different. *Cf. Wilder v. United States*, 806 F.3d 653, 659 (1st Cir. 2015) (defendant failed to show "a reasonable probability that his presence during the individual voir dire would have resulted in a different jury composition or verdict.").

## III.    The "missing witness" claims are meritless, and any error was harmless

### A.    Procedural history

On the second day of trial, the government moved to preclude the defense from asking the jury to draw a negative inference from the fact that the government had not called a witness from the Cape Verdean prosecutor's office to testify about its custody of Brandao's original passport. [A: 15, 463-464]. It observed that such an argument would be unfair and misleading because (a) Cape Verdean officials had specifically refused to provide such a witness when the government made a formal request for one through diplomatic channels, and (b) the district court's subpoena power did not extend to employees of foreign governments residing abroad. [A: 463].

In opposing this motion later the same day, Brandao suggested "there was a process [the government] could have engaged in to bring the clerk [of the court in Cape Verde] to testify" in the United States. [A: 465]. In support of his theory that such a "process" existed, Brandao noted that the Cape Verdean authorities had supplied documents from the pending criminal case, and he speculated they did so

because they expected "reciprocity" if they ever needed unspecified documents from the United States. [A: 466]. If this were so, he surmised, it was possible the government might have secured live witness testimony in exchange for "the United States promis[ing] reciprocity relating to the cooperation of witnesses." [A: 466]. Relatedly, Brandao also sought a missing witness instruction stating that the jury could infer from the fact that the government did not call witnesses from the Cape Verdean court or the prosecutor's office that their testimony would have been "unfavorable to the government." [A: 474-476].

Later that day, the district court declined to give a missing witness instruction or to allow the defense to argue the jury should draw a negative inference from the government's simple failure to call a witness from the Cape Verdean prosecutor's office. [A: 291]. The court found the defense had not shown that such a witness "was peculiarly available to the government" because there was "a reasonable explanation for the witness's absence" given that "[t]he Cape Verdean government did not want to send someone to testify and the United States Attorney's Office could not force them to do so." [A: 291].

When the court asked whether defense counsel wished to be heard further, counsel suggested she possessed "emails" indicating a process could have been used to obtain the presence of a witness. [A: 291-292]. The government responded that it had wished to call a specific witness from the Cape Verdean prosecutor's office "to

confirm what we believe is unambiguously stated in the documents, that the prosecutorial office and the other offices in Cape Verde have had the defendant's U.S. passport essentially from the beginning and [had] never given it back to him." [A: 292-293]. But, the government explained, when the Office of International Affairs of the U.S. Justice Department made a "formal request" through official channels "to the Cape Verdean government . . . they, quite simply, turned us down" and "would not send or make an individual available to testify in the United States court." [A: 293]. As a result, although the government "very much would have wanted this witness," it "couldn't get him." [A: 293]. When the court asked defense counsel if she had anything further to say in light of the government's proffer, she stated: "No, your Honor. I would just preserve my objection to not providing the instruction and to preclude my argument in any respect." [A: 294]. The court replied that "[y]our objection is preserved but overruled." [A: 294].

## B.    There was no clear error or abuse of discretion

Brandao challenges the above rulings as a denial of his due process rights. [Br. 31-36]. He establishes neither error nor prejudice.

The district court found the government had formally requested that a witness from the Cape Verdean prosecutor's office testify at trial and that Cape Verdean authorities had rejected that request, leaving the government without any recourse. That finding was amply supported by the government's proffer detailing the official

23

application it had made to Cape Verde through the Office of International Affairs of the U.S. Justice Department. Brandao's counsel did not respond to—let alone fault—any aspect of this proffer, and she offered nothing but unsupported theories concerning a possible alternative "process" through which a Cape Verdean witness might have been obtained.

On this record, there is no basis to conclude the district court's finding here was clearly erroneous. This would remain so even under the untenable assumption that defense counsel's speculations were enough to create a "competing plausible inference," since it is settled that this is "insufficient to warrant reversal" under the clear-error standard. *United States v. Vasquez-Landaver*, 128 F.4th 358, 363 n.4 (1st Cir.), *cert. denied*, 145 S. Ct. 2767 (2025). Brandao cites no authority for his apparent position [Br. 36] that the court could not rely on the government's proffer and that the government was required to submit "evidence" concerning the steps it had taken to secure the testimony of a Cape Verdean witness.

Because the court supportably found that it was beyond the power of the government to compel the attendance of a Cape Verdean witness, it can hardly have abused its discretion in declining to give a missing witness instruction on the basis that such a witness was not "peculiarly available to the government." *United States v. Orlandella*, 96 F.4th 71, 98 (1st Cir. 2024) (cleaned up). Such a witness was not "available" to the government in any respect, much less "peculiarly" available to it.

24

A decision of this Court blocks any contrary claim. There, the Court affirmed a district court's refusal to give a missing witness charge where the would-be witnesses were foreign nationals residing overseas, and it also upheld the court's affirmative instruction to the jury that it could "'not make any inferences based upon any witness who was not called to testify'" since these individuals "'were not called . . . to testify because they were beyond the subpoena power of either party.'" *United States v. Aboshady*, 951 F.3d 1, 9-11 (1st Cir. 2020).

Just as in *Aboshady*, Brandao does not "dispute that neither he nor the government had the power to compel [a witness from the Cape Verdean prosecutor's office] to testify at trial, as he does not dispute that neither party had the authority to subpoena a foreign national located in a foreign country." 951 F.3d at 11. Also as in *Aboshady*, Brandao "develops no argument that the explanation provided to the District Court reveals that either [the witness's] reason for being unwilling to come to testify or that the government's reason for not calling him had to do with any hostility to or disagreement on his part with the government's case against [Brandao]." *Id*. To the contrary, if anything, the record indicates a witness would have testified but for his government's refusal to allow it and that his testimony likely would have confirmed what other evidence already made clear: that Brandao's passport had remained in Cape Verde at all relevant times. [A: 292-294, 463].

*Aboshady* thus dooms Brandao's position that he was entitled to a missing witness instruction.

*Aboshady* likewise forecloses any claim that the district court abused its discretion in disallowing a defense argument that the jury should draw a negative inference from the mere fact that the government had not called a Cape Verdean official as a witness. This is particularly so given that the court correctly determined the government had tried and failed to secure the presence of such a witness and had no evident means of doing so [A: 291], and where the record also reveals that any testimony from a Cape Verdean official likely would have helped the government [A: 292-293]. *See Aboshady*, 951 F.3d at 9-12. This case is easier to decide than *Aboshady*, where, unlike here, the district court expressly warned the jury "not to make any inference as to why the government did not call the witness," though it "did not instruct the jury not to consider the lack of testimony from [the witness] in deciding whether the government had met its burden to prove Aboshady's guilt beyond a reasonable doubt on any of the charges." *Id.* at 11.

In the end, Brandao's counsel was fully able to—and did—argue that the government had offered insufficient evidence concerning the whereabouts of his passport at key junctures, implying that a Cape Verdean witness might have filled the gaps: "And there are so many unanswered questions as to where the passport and the other documents were from December 12th of 2022 until May 16th of 2023 when

Agent Pigman took photographs." [A: 324]. Relatedly, counsel sought to persuade the jury that there were gaps in the "chain of custody" for the passport [A: 319-320], and that the court records cited by the government did not prove "the passport was in the possession of the prosecution the entire time" [A: 324]. Nothing prevented counsel from highlighting "missing proof," *United States v. Jimenez-Torres*, 435 F.3d 3, 12 (1st Cir. 2006), which she freely did. The court only declined to approve a defense argument that the jury could infer from the fact that the government did not call a Cape Verdean official that such a witness's testimony would have hurt the government's case—an argument that would have been misleading and unfair under the circumstances as represented by the government and accepted by the court. It follows that Brandao was no worse off than the defendant in *Aboshady*—a decision he does not address.

## C.     Any error was harmless

Regardless, any conceivable error here was manifestly harmless. Given the strength of the government's case and the other factors discussed above [*supra* 14-15], including the ability of the defense to highlight omissions in the evidence concerning the location of Brandao's passport, "it is highly probable that [any] error did not contribute to the verdict." *United States v. Maldonado-Vargas*, 159 F.4th 69, 80 (1st Cir. 2025) (cleaned up). In fact, even if Brandao could somehow establish an

27

error of constitutional magnitude, any such error would be "harmless beyond a reasonable doubt on this record." *Aboshady*, 951 F.3d at 12.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court affirm the judgment.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:   /s/ *Donald C. Lockhart*
DONALD C. LOCKHART
Assistant U.S. Attorney

28

# CERTIFICATE OF COMPLIANCE WITH
## Rule 32(a)

### Certificate of Compliance with Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1.  This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,904 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Times New Roman 14 point, in Microsoft Word version 2019.

 /s/ *Donald C. Lockhart*
Donald C. Lockhart
Assistant U.S. Attorney

Dated:  December 19, 2025

29

**CERTIFICATE OF SERVICE**

I, Donald C. Lockhart, Assistant U.S. Attorney, hereby certify that on December 19, 2025, I electronically served a copy of the foregoing document on the following registered participant of the CM/ECF system:

Jillise McDonough
107 Union Wharf
Boston, MA 02109

/s/ *Donald C. Lockhart*
Donald C. Lockhart
Assistant U.S. Attorney